**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOHN NEWKIRK,** individually, and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>**v.**<br><br>**GOOSEHEAD INSURANCE AGENCY, LLC,**<br><br>*Defendant***.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:25-cv-1217<br><br>**<u>CLASS ACTION PETITION</u>**<br><br>**DEMAND FOR JURY TRIAL** |

**<u>PLAINTIFF'S CLASS ACTION PETITION AND JURY DEMAND</u>**

Plaintiff John Newkirk ("Plaintiff") brings this Class Action Petition against Goosehead Insurance Agency, LLC ("Goosehead" or "Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and belief as to all other matters:

## I. INTRODUCTION

1. This class action arises out of the recent data security incident and data breach that was perpetrated against Defendant (the "Data Breach"), which held in its possession certain personally identifiable information ("PII" or the "Private Information") of Plaintiff and other current and former employees and customers of Defendant, the putative class members ("Class"). Defendant's public notice of the Data Breach states that they learned of the incident on or around September 26, 2025.[1]

[1] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/e0fcde3b-4f4f-4c5a-9397-2291f8fa6fa9.html

2. Defendant Goosehead Insurance Agency, LLC is a Texas-based insurance brokerage firm that offers personal lines of insurance products, including homeowners, auto, flood, and other property and casualty insurance policies. Goosehead operates through both corporate and franchise locations across the United States, partnering with multiple insurance carriers.[2]

3. Defendant identified it was subject to a cyberattack on or about March 13, 2025 (the "Data Breach"). Defendant investigated the Data Breach and confirmed that an unauthorized actor accessed Defendant's systems between March 6, 2025, and March 13, 2025, and had access to files that included the following: "name, date of birth, Social Security Number, driver's license and/or state issued identification number, financial account number, financial account routing number, and financial institution name."[3]

4. Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information was subjected to unauthorized access by ransomware group, CHAOS, and precisely what type of information was accessed.

5. Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

---

[2] Defendant Goosehead Insurance "Smarter Insurance. By Design." https://www.goosehead.com (last accessed October 27, 2025).

[3] Defendant's Notice of Security Incident, **Exhibit A**.

6. Defendant, through its employees, disregarded the rights of Plaintiff and Class Members (defined below) by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions. Defendant also failed to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Private Information and failed to take standard and reasonably available steps to prevent the Data Breach.

7. In addition, Defendant's employees failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant's employees (presumably in the IT department) properly monitored its property, it would have discovered the intrusion sooner.

8. Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

9. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes. These crimes include opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

10. Because of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

11. Plaintiff and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

12. Through this Petition, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

13. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

14. Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) breach of implied contract, and (iii) unjust enrichment.

## II. PARTIES

15. Plaintiff is a citizen of Manfield, Texas and intends to remain there throughout this litigation.

16. Plaintiff provided Defendant with his sensitive PII as a condition of applying for employment with Defendant.

17. Defendant Goosehead Insurance Agency, LLC is a Delaware limited-liability company, maintaining its principal place of business at 1500 Solana Blvd, Building 4, Suite 4500, Westlake, Texas.

18. Defendant's Registered Agent is Corporation Service Company d/b/a CSC-Lawyers Inc and can be located at 211 E. 7th Street Suite 620, Austin, TX 78701.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Members of the proposed class and Defendant are citizens of different states, as Defendant has notified individuals of the Data Breach in other states.[4] Additionally, there are 100 putative Class Members.[5]Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

20. This Court has personal jurisdiction over Defendant because it operates, and is headquartered, in this District and conduct substantial business in this District.

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(l) because a substantial part of the events giving rise to this action occurred in this District. Defendant is also based in this District, maintains Plaintiff's and Class Members' Private Information in this District, and has caused harm to Plaintiff and Class Members from and/or in this District.

## III. FACTUAL ALLEGATIONS

### *A. DEFENDANT'S BUSINESS*

22. Defendant Goosehead Insurance Agency, LLC is a Texas-based insurance brokerage firm that offers personal lines of insurance products, including homeowners, auto, flood, and other property and casualty insurance policies. Goosehead operates through both corporate and franchise locations across the United States, partnering with multiple insurance carriers.

23. Plaintiff and Class Members include prospective, current, and former employees and customers of Defendant.

---

[4] Office of the Maine Attorney General, "Data Breach Notifications" https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/e0fcde3b-4f4f-4c5a-9397-2291f8fa6fa9.html (last accessed October 27, 2025).
[5] *Id.*

24. In the ordinary course of applying for employment with Defendant, Plaintiff and Class Members were required to provide (and Plaintiff did provide) Defendant with their sensitive, personal, and private information, such as his or her "name, date of birth, Social Security Number, driver's license and/or state issued identification number, financial account number, financial account routing number, and financial institution name."[6]

25. On information and belief, Defendant stored this Private Information on its computer network system located at its principal place of business in Texas.

26. Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

27. By collecting and retaining the Private Information of Plaintiff and Class Members for its own financial benefit, Defendant assumed an ongoing duty to implement and maintain reasonable safeguards to protect such information for unauthorized disclosure to third parties. This duty extended not only to safeguarding the information while in Defendant's possession, but also to the proper and secure disposal or destruction of the Private Information of prospective, current, and former employees and customers.

***B. The Data Breach***

28. A Data Breach occurs when unauthorized cyber criminals access a computer network system that has not been adequately and reasonably secured.

29. In Texas, "breach of the security of the system" means "unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of sensitive

[6] Defendant's Notice of Security Incident, **Exhibit A**.

personal information maintained by a person, including data that is encrypted if the person accessing the data has the key required to decrypt the idea."[7]

30. Likewise, "Personal information" means: any information, including sensitive data, that is linked or reasonably linked to an identified or identifiable individual.[8]

31. The State of Texas requires that any "person who conducts business in this state and owns or licenses computerized data that includes sensitive personal information shall disclose any breach of system security, after discovering or receiving notification of the breach, to any individual whose sensitive personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Tex. Bus. & Com. Code Ann. § 521.053(b). In fact, "breach of a security system" is defined as "[the] unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of sensitive personal information." Tex. Bus. & Com. Code Ann. § 521.053(a).

32. On or about October 10, 2025, Defendant mailed Plaintiff a Notice of Data Security Incident[9] that stated in part:

> **What Happened?**
>
> On or around March 13, 2025, Goosehead became aware of suspicious activity within our network environment and promptly began an investigation. The investigation determined that between March 6, 2025 and March 13, 2025, an unauthorized actor accessed certain systems within the environment and copied certain files from those systems. Although we have no evidence of any identity theft or fraud occurring ni connection with this incident, Goosehead conducted a review of the copied files to determine the information contained therein and to whom it relates for purposes of providing notice.
>
> **What Information was Involved?**
>
> Our review determined that information related to certain individuals was present in the involved files. Goosehead is notifying you now out of an abundance of

[7] TEX. BUS. & COM. CODE § 521.053
[8] TEX. BUS. & COM. CODE § 541.001
[9] *Id.*

> caution because the information involved in this incident includes your Social Security number, driver's license number and/or state identification number, and name. At this time, we have no indication that your information was subject to actual or attempted identity theft or fraud as a result of this incident.

33. Plaintiff's notice letters were dated nearly seven months after the Data Breach occurred.

34. Within this notice, Defendant failed to state whether it was able to contain or end the cybersecurity threat, leaving victims in fear of their Private Information being leaked to the public or offered for sale to the public by data brokers and whether their Private Information that Defendant continues to maintain is secure. Defendant also failed to state how the breach itself occurred. All this information is vital to victims of a data breach due to the sensitivity, importance and value of the Private Information compromised in this specific breach.

35. Plaintiff and Class Members provided Defendant with their Private Information reasonably expecting and belief that Defendant had implied a promise and accepted the responsibility to keep such information confidential and secure from unauthorized access as part of their contract to do business together.

36. Defendant's data security obligations were particularly important given the substantial increase in Data Breaches in the financial services industry preceding the date of the breach.

37. In 2023, a record 3,205 data breaches occurred, resulting in around 353,027,892 individuals' information being compromised, a 78% increase from 2022.[10] Of the 2023 recorded data breaches, 744 of them, or 23%, were in the financial services industry.[11] The 744 reported

---

[10] *See* Identity Theft Resource Center, *2023 Data Breach Report* (January 2024), *available at* https://www.idtheftcenter.org/publication/2023-data-breach-report/ (last visited October 27, 2025).
[11] *Id.*

breaches reported in 2023 exposed nearly 61 million sensitive records. This is up from 2022 where there were a reported 269 breaches that exposed approximately 27 million sensitive records in.[12]

38. Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

39. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

### *C. DATA BREACHES ARE PREVENTABLE*

40. Defendant failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

41. Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

42. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[13]

43. To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of

---

[12] *Id.* at 11, Fig.3.

13 How to Protect Your Networks from RANSOMWARE, at 3, available at: https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited October 27, 2025).

ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[14]

44. To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

> **<u>Secure Internet-Facing Assets</u>**
> - Apply latest security updates
> - Use threat and vulnerability management
> - Perform regular audit; remove privileged credentials;
>
> **<u>Thoroughly investigate and remediate alerts</u>**
> - Prioritize and treat commodity malware infections as potential full compromise;
>
> **<u>Include IT Pros in security discussions</u>**
> - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;
>
> **<u>Build credential hygiene</u>**
> - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;
>
> **<u>Apply principle of least-privilege</u>**
> - Monitor for adversarial activities
> - Hunt for brute force attempts
> - Monitor for cleanup of Event Logs
> - Analyze logon events;
>
> **<u>Harden infrastructure</u>**
> - Use Windows Defender Firewall
> - Enable tamper protection
> - Enable cloud-delivered protection
> - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[15]

---

[14] *Id.* at 3-4.

[15] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last viewed October 27, 2025).

45. Given that Defendant was storing the Private Information of Defendant's prospective, current, and former employees and customers, Defendant could and should have implemented all the above measures to prevent and detect cyberattacks.

46. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the Private Information of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiff and Class Members.

### *D. Defendant Acquires, Collects & Stores prospective, current, and former employees' and customers' Private Information*

47. Defendant acquires, collects, and stores Private Information of its prospective, current, and former employees and customers.

48. As a condition of applying for employment with Defendant, Defendant requires prospective, current, and former employees and customers to entrust it with highly sensitive personal information.

49. By obtaining, collecting, and using Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

50. Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted Defendant, absent a promise to safeguard that information.

51. Defendant promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

52. Plaintiff and the Class Members, relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### *E. Value Of Private Information*

53. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[16]The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[17]

54. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[18]

55. For example, Personal Information can be sold at a price ranging from $40 to $200.[19] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[20] Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life. The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security

---

[16] 17 C.F.R. § 248.201 (2013).
[17] *Id.*
[18] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/
[19] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/
[20] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

56. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised for some Class Members in the Data Breach, are among the worst kind of Private Information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

57. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers and names.

58. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

59. Defendant knew or should have known of the risks and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

### *F. Defendant Fails to Comply with FTC Guidelines*

60. The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

61. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal Private Information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[21]

62. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[22]

63. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

64. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect the Private Information in their possession by treating the failure

---

[21] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited October 27, 2025).

[22] *Id.*

to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.[emphasis added].

65. Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

66. These FTC enforcement actions include actions against entities like Defendant. See, e.g., In the Matter of LabMD, Inc., A Corp, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

67. Defendant failed to properly implement basic data security practices.

68. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to prospective, current, and former employees' and customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

69. Defendant was always fully aware of its obligation to protect the PII of its prospective, current and former employees and customers. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *G. Defendant Fails to Comply with Industry Standards*

70. As shown above, experts studying cyber security routinely identify professional businesses and their affiliates as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

71. Several best practices have been identified that a minimum should be implemented by entities like Defendant, including, but not limited to, educating all employees; using strong passwords; creating multi-layer security, including firewalls, antivirus, and anti-malware software;

encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data; and limiting which employees can access sensitive data.

72. Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

73. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including, without limitation, PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

74. These foregoing frameworks are existing and applicable industry standards in the industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

### *H. Defendant Failed to Comply with Texas's Identity Theft Enforcement and Protection Act*

75. Defendant's failure to encrypt or ensure that Plaintiff's and Class Members' sensitive information and implement or ensure that minimum and basic cybersecurity precautions that a reasonable and prudent business would under similar circumstances constitutes a reckless disregard for Plaintiff and Class members' privacy rights and rises to the level of gross negligence.

76. Under Tex. Bus. & Com. Code Ann. § 521.002, the term "Sensitive Personal Information" means: an individual's first name or first initial and last name in combination with

any one or more of the following items, if the name and the items are not encrypted: (i) social security number; (ii) driver's license number or government-issued identification number; or (iii) account number or credit or debit card number in combination with any required security code, access code, or password that would permit access to an individual's financial account; or information that identifies an individual and relates to: (i) the physical or mental health or condition of the individual; (ii) the provision of health care to the individual; or (iii) payment for the provision of health care to the individual.

77. An entity doing business in Texas must "implement and maintain reasonable procedures, including taking any appropriate corrective action, to protect and safeguard from unlawful use or disclosure of any sensitive personal information collected or maintained by the business in the regular course of business.[23]

78. An entity doing business in Texas must "destroy or arrange for the destruction of customer records containing sensitive personal information within the business's custody or control that are not to be retained by the business."[24]

79. Defendant failed to implement and maintain reasonable procedures to protect and safeguard the Plaintiff and the Class Member's Sensitive Personal Information from unlawful use and disclosure, including ensuring that the proper cyber security was implemented and maintained prior to and while collecting Plaintiff and Class members PII, in violation of the Texas Identity Theft Enforcement and Protection Act, Tex. Bus. & Com. Code Ann. § 521.001 *et seq.*

### *I. Plaintiff and the Class Members Have and Will Experience Substantial Harm*

80. Plaintiff and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

---

[23] Tex. Bus. & Com. Code Ann. § 521.052
[24] *Id.*

81. The ramifications of Defendant's failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes. According to experts, one out of four data breach notification recipients become a victim of identity fraud.

82. Because of Defendant's failures to prevent—and to timely detect—the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

- The loss of the opportunity to control how their PII is used;
- The diminution in value of their PII;
- The compromise and continuing publication of their PII;
- Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;
- Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;
- Delay in receipt of tax refund monies; Unauthorized use of stolen PII; and
- The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

83. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

84. The value of Plaintiff's and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals often post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

85. It can take victims years to spot identity or PII theft, giving criminals plenty of time to abuse that information for money.

86. One such example of criminals using PII for profit is the development of "Fullz" packages.

87. Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

88. The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen PII is being misused, and that such misuse is traceable to the Data Breach.

89. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that

year, resulting in more than $3.5 billion in losses to individuals and business victims, and the numbers are only rising.

90. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good" Defendant did not rapidly report to Plaintiff and the Class that their PII had been stolen.

91. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

92. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

93. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

94. The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[25]

---

[25] Statement of FTC Commissioner Pamela Jones Harbour-Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009).(last visited October 27, 2025).

95. The FTC has also issued many guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires:

- encrypting information stored on computer networks;
- retaining payment card information only as long as necessary;
- properly disposing of personal information that is no longer needed;
- limiting administrative access to business systems;
- using industry-tested and accepted methods for securing data;
- monitoring activity on networks to uncover unapproved activity;
- verifying that privacy and security features function properly;
- testing for common vulnerabilities; and
- updating and patching third-party software.

96. According to the FTC, unauthorized PII disclosures ravage consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.26

97. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

98. Defendant's failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

---

[26] *See* Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012), *available at* https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last visited September 18, 2025).

99. Plaintiff and Class Members now face an increased risk of fraud and identity theft.

### *J. Data Breaches Put Consumers at an Increased Risk of Fraud and Identity Theft*

100. Data Breaches such as the one experienced by Defendant are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

101. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."27

102. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (possibly an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[28]

103. Identity thieves use stolen personal information such as Social Security numbers for various crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

104. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give

[27] U.S. Government Accountability Office, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf (last visited September 18, 2025) ("GAO Report").
[28] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited September 18, 2025).

the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

105. Theft of Private Information is gravely serious. PII is a valuable property right.[29] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

106. It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.
>
> *See* GAO Report, at p. 29.

107. Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

108. There is a strong probability that all the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

---

[29] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

109. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[30]

110. PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

111. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for more credit lines.[31]

112. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[32]

113. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

114. It is also hard to change or cancel a stolen Social Security number.

115. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."33

---

[30] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), *available at* https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited October 27, 2025).

[31] Social Security Administration, *Identity Theft and Your Social Security Number* (2018), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited October 27, 2025).

[32] *Id* at 4.

[33] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (February 9, 2015),

116. Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## IV. DEFENDANT'S BREACH

117. Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to detect timely that Class Members' Private Information had been compromised;

f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g. Failing to secure its stand-alone personal computers, such as reception desk computers, even after discovery of the data breach.

118. As the result of computer systems needing security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and

---

*available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited July 31, 2025).

inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

119. Plaintiff and Class Members now face an increased risk of fraud and identity theft.

### *K. THE DATA BREACH WAS COMMITTED BY NOTORIOUS RANSOMWARE GROUP CHAOS*

120. According to data security tracker, Claim Depot, the Data Breach was highly severe, stemming from a ransomware attack carried out by a threat group identified as "CHAOS." The group claimed responsibility for stealing approximately 300 GB of data belonging to Goosehead and publicly posted about the incident on the dark web on March 31, 2024. In addition to encrypting company files, the attackers also removed sensitive data. The company reported that the breach affected at least 17,379 Texas residents, 47 Massachusetts residents, 13 in New Hampshire, and 5 Maine residents.[34]

121. Actors behind CHAOS practice phishing and social-engineering tactics to gain access, install remove access tools like AnyDesk or ScreenConnect, steal data, and then deploy ransomware that encrypts files. CHAOS also uses double extortion tactics, threatening to leak stolen data if the ransom is not paid.[35]

## V. PLAINTIFF'S EXPERIENCE

122. Plaintiff John Newkirk is and at all times mentioned herein was an individual citizen of Texas, residing in the city of Mansfield.

123. Plaintiff provided Defendant with his sensitive PII as a condition of applying for employment with Defendant. Plaintiff received notice of the Data Breach around October 10,

---

[34] ClaimDepot "Goosehead Insurance Confirms Data Breach Exposes SSns Following Ransomware Attack" https://www.claimdepot.com/data-breach/goosehead-insurance-2025 (last accessed October 27, 2025).
[35] Cisco Talos "Unmasking the new Chaos RaaS group attacks" https://blog.talosintelligence.com/new-chaos-ransomware/?utm_source=chatgpt.com (last accessed October 27, 2025).

2025, informing him that his sensitive information was part of Defendant's Data Breach (Exhibit A).

124. Plaintiff is careful about sharing his sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

125. Plaintiff stores any documents containing his sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for his sensitive online accounts.

126. Had Plaintiff been aware that Defendant's computer systems were not secure, he would not have entrusted his personal data to Defendant.

127. Because of the Data Breach, Defendant advised Plaintiff to take certain steps to protect his Private Information and otherwise mitigate his damages.

128. Because of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Security Incident and self-monitoring his accounts to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. This time was spent at Defendant's direction by way of the Data Breach notice where Defendant recommended that Plaintiff mitigate his damages by, among other things, monitoring his accounts for fraudulent activity.

129. Even with the best response, the harm caused to Plaintiff cannot be undone.

130. Plaintiff suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and have anxiety and increased concerns for the loss of his privacy.

131. Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of criminals.

132. Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

## VI. PLAINTIFF AND CLASS MEMBERS DAMAGES

133. To date, Defendant has done little to nothing to provide Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant has not offered any form of identity monitoring services, despite Plaintiff and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

134. Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

135. Plaintiff's Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

136. Plaintiff and Class Members were damaged in that their Private Information is in the hands of cyber criminals.

137. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

138. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

139. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

140. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

141. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

142. Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

143. Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

144. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft prevention;

d. Addressing their inability to withdraw funds linked to compromised accounts;

e. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f. Placing "freezes" and "alerts" with credit reporting agencies;

g. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h. Contacting financial institutions and closing or modifying financial accounts;

i. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j. Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

145. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

146. Further, because of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

147. As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## VII. CLASS ALLEGATIONS

148. Plaintiff brings this nationwide class action on behalf of himself and on behalf of others similarly situated under Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

149. The Nationwide Class that Plaintiff seek to represent is defined as follows:

> **All persons whose Private Information was actually or potentially accessed or acquired during the March 2025 Data Breach (the "Class").**

150. Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; all federal, state, or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

151. Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

152. Numerosity, Fed R. Civ. P. 23(a)(l): Class Members are so Many that joinder of all members is impracticable. Upon information and belief, there exceed 10,000 individuals whose Private Information may have been improperly accessed in the Data Breach, and each Class is apparently identifiable within Defendant's records. The exact number of Class Members is unknown to Plaintiff now, but Defendant has reported to the Office of the Attorney General of Texas that 13,379 individuals in Texas alone were affected by the Data Breach.[36]

---

[36] Office of the Attorney General of Texas, "Data Security Breach Reports" https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last accessed September 18, 2025).

153. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant had duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d. Whether Defendant failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e. When Defendant learned of the Data Breach;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

k. Whether Defendant violated the consumer protection statutes invoked herein;

l. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages because of Defendant's wrongful conduct;

m. Whether Plaintiff and Class Members are entitled to restitution because of Defendant's wrongful conduct; and

n. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced because of the Data Breach.

154. Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their PII compromised because of the Data Breach, because of Defendant's misfeasance.

155. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged here apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct toward the Class as a whole, not on facts or law applicable only to Plaintiff.

156. Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

157. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged here; it will permit many Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of modest claims by certain Class Members, who could not individually

afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

158. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

159. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

160. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

161. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Petition.

162. And Defendant has acted or refused to act on grounds generally applicable to the Classes and thus final injunctive or corresponding declaratory relief for the Class Members is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

163. Likewise, issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

e. Whether Defendant breached the implied contract;

f. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members; and

i. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief because of Defendant's wrongful conduct.

## VIII. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Putative Rule 23 Class)

164. Plaintiff and the Class repeat and re-allege every allegation as if fully set forth herein.

165. Defendant required Plaintiff and Class Members to submit non-public personal information to apply for and obtain employment and to do business with them.

166. By collecting and storing this data in Defendant's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

167. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

168. Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class, which is recognized by laws and regulations including but not limited to the Federal Trade Commission Act, Tex. Bus. & Com. Code Ann. § 521.052, as well as common law. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information, a necessary part of obtaining employment and gym membership with Defendant.

Defendant were in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

169. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

170. Defendant further had a duty to use reasonable care in protecting confidential data because Defendant is bound by industry standards to protect confidential Private Information.

171. Defendant also had a duty under Tex. Bus. & Com. Code Ann. § 521.052(a) "to implement and maintain reasonable procedures, including taking any appropriate corrective action, to protect from unlawful use or disclosure any sensitive personal information collected or maintained by [Defendant] in the regular course of business."

172. Defendant also had a duty under Tex. Bus. & Com. Code Ann. § 521.052(b) to destroy any Private Information that was no longer necessary for it to maintain.

173. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to detect timely that Class Members' Private Information had been compromised;

f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g. Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

174. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

175. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

176. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members are at a current and ongoing risk of identity theft, and Plaintiffs and Class Members sustained compensatory damages including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) diminution of value of their PII; (h) future costs of identity theft monitoring; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

177. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

178. Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

179. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## COUNT II
## BREACH OF IMPLIED CONTRACT
## (On behalf of Plaintiff and the Putative Rule 23 Class)

180. Plaintiff and the Class repeat and re-allege every allegation as if fully set forth herein.

181. Plaintiff and Class Members provided their Private Information to Defendant in exchange for employment and Defendant's services, in doing so they entered implied contracts with Defendant under which Defendant agreed to reasonably protect such information.

182. Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

183. In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including the Federal Trade Commission Act, Texas statutes, and adhered to industry standards.

184. Plaintiff and Class Members provided labor to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

185. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

186. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that they adopted reasonable data security measures.

187. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

188. Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

189. As a direct and proximate result of Defendant's breach of the implied promises, Plaintiff and Class Members are at a current and ongoing risk of identity theft, and Plaintiff and Class Members sustained incidental and consequential damages including: (a) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) financial "out of pocket" costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) loss of time due to increased spam and targeted marketing emails; (f) diminution of value of their PII; (g) future costs of identity theft monitoring; (h) and the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

190. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

191. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT III**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Putative Rule 23 Class)**

192. Plaintiff and the Class repeat and re-allege every allegation as if fully set forth herein.

193. Plaintiff brings this claim individually and on behalf of all Class Members. This count is pled in the alternative to the breach of contract count above.

194. Upon information and belief, Defendant funds its data security measures entirely from its general revenue.

195. As such, a portion of the revenue attributable to Plaintiff's and Class Members' labor and purchases is to be used to provide a reasonable level of data security.

196. Plaintiff and Class Members conferred a monetary benefit on Defendant. They purchased goods and staffed Defendant's business and in so doing provided Defendant with their Private Information. In exchange, Plaintiff and Class Members should have received from Defendant the wages that were the subject of the transaction and appropriate protection for their Private Information.

197. Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

198. Defendant enriched itself by saving the costs Defendant reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal

Information. Rather than providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by using cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

199. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

200. Defendant failed to secure Plaintiff's and Class Members' Private Information and thus did not provide full compensation for the benefit Plaintiff and Class Members provided.

201. Defendant acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices alleged.

202. If Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

203. Plaintiff and Class Members have no adequate remedy at law.

204. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to:

a. actual identity theft;

b. the loss of the opportunity of how their Private Information is used;

c. the compromise, publication, and/or theft of their Private Information;

d. out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information;

e. lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

f. the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and

g. future costs in terms of time, effort, and money to be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiff and Class Members.

205. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

206. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## IX. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on behalf of himself and the Class described above seeks the following relief:

a. For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiff and his counsel to represent the Class, and finding that Plaintiff is a proper representative of the Class requested herein;

b. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c. For equitable relief compelling Defendant to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d. For an order directing Defendant to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

e. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

f. For an award of punitive damages, as allowable by law;

g. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

h. Pre- and post-judgment interest on any amounts awarded; and

i. Any other relief that this court may deem just and proper.

## X. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 28th, 2025

Respectfully submitted,

*/s/Leigh S. Montgomery*
Leigh S. Montgomery
Texas Bar No. 24052214
Jarrett L. Ellzey
Texas Bar No. 24040864
Christopher E. Torres
Texas Bar No. 24115595
lmontgomery@eksm.com
jellzey@eksm.com
ctorres@eksm.xom
Service only: service@eksm.com
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931

**COUNSEL FOR PLAINTIFF AND THE PUTATIVE CLASS**